UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF ILLINOIS

PHILLIP E. JAROS,                    )
          Plaintiff,                 )
                                     )        Cause No. 11-168-JPG
     -vs-                            )
                                     )
                                     )
GLADYSE TAYLOR, Director, Illinois   )
Department of Corrections, and;      )
                                     )        Jury Demand
SANDRA FUNK, Acting Manager, for     )
the Transfer Coordinator's Office,   )
Illinois Department of Corrections,  )
and;                                 )
                                     )
VICTOR DOZIER, Warden, Vandalia      )
Correctional Center, and;            )
                                     )
RONALD MEEK, Former Warden,          )
Vandalia Correctional Center, and;   )
                                     )
TRACY McCONAUGHY, Americans with     )
Disibalities Act (ADA) Coordinator,  )
Vandalia Correctional Center, and;   )
                                     )
KEVIN OLLIGES, Supervisor, Clinical  )
Services, Vandalia Correctional      )
Center, and;                         )
                                     )
CLARK SCHULTZE,  Grievance Officer,  )
Vandalia Correctional Center, and;   )
                                     )
TEANAH HARTER, Counselor and Head    )
Grievance Officer, Vandallia         )
Correctional Center, and;            )
                                     )
MARY HALFORD, Director of Nursing,   )
Health Care Unit, Vandalia           )
Correctional Center, and;            )
                                     )
DEBBIE MAGNUS, Health Care Unit      )
Administrator, Vandalia              )
Correctional Center, and;            )
                                     )
 STATE OF ILLINOIS. AND;             )
                                     )
 ILLINOIS DEPARTMENT OF CORRECTIONS  )

          DEFENDANTS,

               C O M P L A I N T

## JURISDICTION AND VINUE

1.  This court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1343. The matters of controversy arise under 42 U.S.C. 12101, The Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, as amended 29 U.S.C. 749, 42 U.S.C. §1983, 2000 a-1, 2000 a-6, The Civil Rights Act of 1964.

2.  Vinue properly lies in this dispute pursuant to 28 U.S.C. § 1391 (b)(2), because the events giving raise to this cause of action occurred at the Vandalia Correctional Center ("Vandalia") in Vandalia, Illinois which is located within the Southern District of Illinois.

## PARTIES

1.  Plaintiff Phillip E. Jaros is and was at all times relevant hereto, a prisoner in the custody of the Illinois Department of Corrections ("IDOC"), at the time of the events relevant hereto, plaintiff was incarcerated at Vandalia.

2.  Defendant Gladyse Taylor is the Director of IDOC, she is responsible for the total operation of IDOC, including issuing any and all Directives and Policies, and the supervising the operation of all correctional centers under the control of IDOC. She is sued individually and in official capacity.

3.  Defendant Sandra Funk is the acting Manager of the Transfer Coorcinator's Office for IDOC. She is responsible for the approval of all inmate transfers within IDOC, along with other various duties

assigned to her by the Director.

4. Defendant Victor Dozier is the Warden at Vandalia. He is responsible for the total operation of the prison, and for the supervision and training of all correctional employees and inmates assigned to Vandalia. He issues directives and policies within Vandalia. He is sued individually and in official capacity.

5. Defendant Ronald Meek is the former Warden of Vandalia, he was responsible for the total operation of the prison, and for the supervision and training of all correctional employees and inmates assigned to Vandalia. He issued Directives and Policy within Vandalia during his tenure which ended July 28, 2010. He is sued individually and in offical capacity.

6. Defendant Tracy McConaughy is the Americand With Disabilities Act (ADA) Coordinator of Vandalia (Facility ADA Coordinator). She is the person designated by the Warden to Coordinate efforts of the facility in carrying out its responsibilities under Title II of the Americans With Disabilities Act of 1990. She is sued individually and in her official capacity.

7. Defendant Kevin Olliges is the supervisor of Clinical Services at Vandalia. He is responsible for the supervision and training of the counselors and grievance officers, and other employees of the Clinical Services staff. He is being sued individually and in his official capacity.

8. Defendant Teanah Harter is a counselor, and head grievance officer at Vandalia. She is responsible for submitting inmates for Work Release, and assigning grievance officers to inmates grievances. She also has other duties as assigned by the Warden or the Clinical

3

Services Supervisor. She is sued individually and in her official capacity.

9.   Defendant Debbie Magnus is the Health Care Unit Administrator ("HCUA") for Vandalia. She is responsible for the administration of the Health Care Unit ("HCU"). She issues Policy and Directives for use in the HCU. She also acts as mediator between inmates and the HCU, and provides information to the grievance officers about medical issues when grieved by an inmate. As the HCUA she is responsible for the total operation of the HCU, along with the supervision and training of of employees of the HCU. She is sued individually and in her official capacity.

10.   Defendant Mary Halford is the Director of Nursing for the Vandalia HCU. She is responsible for the supervision and training of the nursing staff. She also has other duties assigned to her by the HCUA, one such duty includes the screening of inmates for the Work Release Program for acute medical problems as outlined in the Administrative Regulation Part 455.30 (b)(5). She is sued individually and in her official capacity.

## PREVIOUS LAWSUITS BY PLAINTIFF

1.   Plaintiff has filed no other lawsuits dealing with the same issues involved in this action or otherwise relating to his imprisonment.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

1.   On May 9, 2010, plaintiff filed an emergency grievance

4

directly to Warden Meek. On May 19, 2010, Meek determined that
the grievance was not of an emergency nature. On May 27, 2010,
plaintiff received the counselors response stating that the
"Warden deemed grievance not an emergency. Vandalia Correctional
Center is not an ADA facility. Offender will have to follow
institutional policy on being submitted for a transfer."

2.  On July 12, 2010, plaintiff filed the grievance with the
grievance officer by dropping the grievance into the box which is
designated for grievances in his living unit.

3.  On July 14, 2010, the grievance was reviewed by the
grievance officer, and then denied.

4.  On July 19, 2010, Warden Meek concurred with the decision
of the grievance officer.

5.  On July 21, 2010, plaintiff appealed the decision to the
Director of IDOC and the Administrative Review Board.

6.  On September 9, 2010, plaintiff filed a grievance
challenging the denial of his application for work release based on
his disabilities, and the violation of the ADA.

7.  On September 14, 2010, plaintiff received a counselor's
response to his grievance, which stated that he still had a medical
hold on him, and that he did not meet the criteria for work release
and will not be resubmitted at this time.

8.  On September 20, 2010, plaintiff filed the grievance with
the grievance officer.

9.  On October 6, 2010, the grievance was denied by the
grievance officer.

10.  On October 7, 2010, Warden Dozier concurred with the
decision of the grievance officer.

11.   On October 23, 2010, plaintiff appealed the decision to the Director and the Administrative Review Board.

## STATEMENT OF FACTS

1.   Plaintiff Phillip E. Jaros, (hereinafter Jaros) is a 57 year old disabled person who suffers from the following  medical conditions:

        (a)   Advanced Osteoarthritis (See Exhibit B)

        (b)   Avascular Necrosis. (See Exhibits A & B)

        (c)   Right hip in need of total replacement (See Exhibit D2)

        (d)   Left hip degenerating (see Exhibit A)

        (e)   Degenerative changes and loss of expected vertebrl body height approximately 10 to 20% on spine. (see Exhibit E)

        (f)   Interameduliary rod and screw traverse on right knee with mild to moderate degenerative change. (See Exhibit F)

        (g)   Moderately advanced disk space narrowing at L2 – L3, and to a lessor degree at L4 – L5, degenerative anterior spur formations from T11 down to S1 of the lumbosacral spine. (See Exhibit F)

        (h)   Advanced degenerative change involving the right hip with presence of subchondral reactive sclerosis and degenerative cyst formation in the femoral head and acetabuium where osteoarthritis is more likely present. (See Exhibit F)

(i)   Right leg 2mm shorter, and AP pelvis right about 3 mm short compared to the left lessor troch. (See Exhibit D-1)

(j)   Tendanitis in left foot.

3.   The osteoarthritis is worse in right leg after a motor vehicle accident (MVA). His ambulation is limited, he uses a cane to walk and was taking narcotic pain medicine. (See Exhibit G)

4.   Jaros takes sleep medication due to waking during the night with pain.

5.   Jaros was prescribed the following medications by his private physician, Bruce Kline M.D., for his healthcare and medication treatment plans:

(a)   Hydrocodone-APAP 10/325 tablet, commonly known as Norco 10/325 tablet. Taken for severe pain. (See Exhibit H)

(b)   Triazolom 0.25 mg tablet, commonly known as Halcion 10/325 tablets. Taken for sleep. (See Exhibit I)

(c)   Proventil HFC 90 mcg inhailer, commonly known as Ventolin. Taken for Asthma. (See Exhibit J)

6.   Jaros was prescribed the following medication by his private podiatrist Cynthia Macardo:

(a)   Diclofenac Sod 75 mg tablet, commonly known as Voltaren 75 mg tablet. Taken for inflimation and pain in left foot for tendinitis. (See Exhibit K)

7.   The medical treatments and conditions stated above limits one or more major life activities for Jaros. Those being the inability to walk for more than half a block to one block before

requiring rest for a 10 to 20 minute period of time. Jaros cannot stand for more than 10 minutes before having to sit due to severe physical pain in his back and right hip and leg. Jaros cannot ascend or descend stairs without extreme and severe physical pain in his back, hip, knees, and legs. He must then rest for a period of at least 10 to 20 minutes. Jaros cannot sit in one position for more than 20 minutes without severe physical pain in his back and lower back, and hips, and knees. He must then stand and move around to stretch for some relief of the severe physical pain. Jaros also suffers from asthma, which causes him not to be able to breathe, or catch his breath. He must stop what he is doing and attempt to gain control of his breathing by using his inhailer.

8.   Jaros is serving a sentence of two (2) years for the offense of Driving While License Revoked or Suspended. (See Exhibit L). A class 4 felony in cause number 09 C4-40791.

9.   Upon his sentencing, Jaros' Judge Noreen Love, undrestood and realized that Jaros has serious medical conditions, and issued an ORDER directed to the Illinois Department of Corrections (IDOC), recommending in part: (See Exhibit M)

> (a)  "That the court recommends that IDOC be cognizant of Mr. Jaros' various medical conditions including ( named conditions) . . . It is recommended that IDOC implement a health treatment and medication plan consistant with his current health treatment plan."

> (b)  "That based upon Mr Jaros' current medical conditions the court recommends that he be considered as a candidate

8

> for any IDOC Electronic Home Monitoring Program, he
> would be eligible for same due to these medical
> conditions."

10. Jaros has to date not been placed on the proper healthcare and medication plans mentioned in the ORDER.

11. Jaros has not been considered for the Electronic Home Monitoring Program, due to its suspension. (See Exhibit N)

## COUNT I - ACCOMMODATIONS

12. On April 23, 2010, Jaros was received at the IDOC Northern Receiving Center (NRC) at Joliet, Illinois.

13. During Jaros' intake procedure, unknown correctional officers seized Jaros' walking cane, and replaced it with a set of crutches. The walking cane was thrown into a storage closet over Jaros' objections. Jaros's walking cane was a hand carved cane with the carving of a wolf's head as the handle, in which he paid over One hundred and fifty dollars for. Jaros was never given the chance to ship the cane out of the facility, or to have it picked up by a friend or relative. Jaros was told to "shut the F__k up, when he objected to the seizure.

14. Upon entering NRC, Jaros was wearing a pair of special orthopedic shoes to accommodate the difference in the length of his legs. During the intake process these shoes were taken from Jaros by unknown correctional officers over Jaros' objection. The officer stated to jaros that he could not have black shoes with the type of soles that they had, and that he could not have them

and he don't give a f__k if they are special shoes. He then ordered Jaros to throw them into a garbage bag, which he did. Jaros objected continuosly, the medical staff then noted on Jaros' medical report that he did in fact have the special shoes. (See Exhibit O) Jaros was issued a pair of canvas deck shoes, commonly known as Joliet Jumpers in IDOC. Walking with these shoes causes Jaros severe physical pain as they do not adjust for the shortness of his right leg.

15. Jaros completed the intake process by interviewing with various intake departments as required for his Social Evaluation as required by 730 ILCS 5/3-8-2. The committed person shall be assigned to an institution or facility is so far as practicable in accordance with the Social Evaluation. Recommendations shall be made for medical, dental, psychiatric, psychological and social service treatment. (See Exhibit DD) Jaros was issued a special needs permit for a low bunk, low gallary, and crutches. (See Exhibit P)

16. On May 10, 2010, Jaros was transferred to the Vandalia Correctional Center (Vandalia).

17. Upon his arrival at Vandalia, Jaros participated in the new inmate intake procedure, which consisted of; a visit to the clothing room for his clothing issue, B of I for fingerprinting and identification information, and the Health Care Unit. The first two consisted of Jaros being forced to descend and ascend several stairs because they are located in the basement area of buildings. There are approximately nine stairs per building Jaros had to descend and ascend with the pair of crutches he was issued at NRC thus causing him severe physical pain in doing so. Jaros complained to the correctional officer who was escorting him that he needed to

10

rest, due to the pain. Jaros was told by the correctional officer that he could rest when he got to his Dorm. Jaros was then taken to B Dorm where he filled out paperwork for his intake. Jaros was then taken to dinner with the other new inmates, and returned to B Dorm, and was from there taken to the Health Care Unit (HCU) for his medical exam.

18. While at HCU, the crutches were exchanged for a 4 leg metal cane. Jaros was given a low bunk permit, and was issued a slow walk permit by the nurse. At that time Jaros was scheduled for a physician visit for evaluation by a physician, and to order medications. Jaros was then assigned to "A" Dorm as his housing unit.

19. A few days later, Jaros was called to the HCU for his physician visit. Dr. Cleveland Rayford M.D., affirmed the items issued by the nurse, and added, soft sole shoes, and naprosyn 500 mg tablets twice daily for pain. (See Exhibit Q)

20. On or about May 12, 2010, Jaros met with his counselor, Teanah Harter (Harter), about his disabilities. Jaros stated to her that he was in need of hand rails to shower, in addition to hand rails in the toilet area whereas he could lower and raise himself, he also stated to Harter that he needed Hand Rails throughout the institution, so that he could stop and rest when the physical pain became to great to walk any farther. Jaros also stated to Harter that he could not raise his legs to ascend and descend stairs in Vandalia Dorms and other buildings he will need to be visiting during his incarceration. There are 3-4 stairs in the Dorms, and Dinning room, which is required for Jaros to use on a daily basis

11

several times a day, which causes Jaros severe physical pain on each occasion. Harter told Jaros that he would just have to deal with it, that Vandalia is not an ADA facility, and they will not put up any hand rails. Jaros asked Harter why he had been transfered to Vandalia which was a non ADA facility, with his disabilities. Harter replied that she did not know.

21.   Jaros then requested that Harter submit him for a transfer to a facility that could accommodate his disabilities. Harter told him that "Vandalia does not do "Medical Transfers"", and that he would have to request a transfer through institutional channels.

22.   Jaros then obtained information that he could not request a transfer per institutional policy, until he had been at Vandalia for a period of six (6) months. Jaros further obtained information that with his sentence of two (2) years, he did not have enough time remaining on his sentence to request a transfer. Jaros is still in this dilemma , since he needed to have at least one year on his sentence remaining to be served, to request a transfer to another institution.

23.   Harter told Jaros that there was nothing he could do, that he was in prison, and that there are rules and policies.

24.   On or about May 18, 2010, Jaros filed an emergency grievance directly to Warden Ronald Meek (Meek). Discribing his medical conditions and problems (See Exhibit R), Jaros also explained that he was unable to shower due to no hand rails in the shower, and had difficulty and severe physical pain when raising and lowering himself on the toilet because there were no hand rails to assist him.  Again Jaros cannot lift his legs and balance while showering.

12

25.  On May 19, 2010, Meek declared the grievance not an emergency, that jaros should submit the grievance in the normal manner. (See Exhibit R)

26.  On May 27, 2010, Jaros received the counselor's response to the filed grievance, which stated "Warden deemed grievance not an emergency. Vandalia Corr Center is not an ADA facility. Offender will have to follow institutional policy on being submitted for a transfer." Signed by Teanah Harter. (See Exhibit R)

27.  Jaros then followed protocol and filed the grievance with the head grievance officer Teanah Harter, by placing the grievance in the Grievance box in his living unit.

28.  On July 14, 2010, Jaros received an answer to his grievance. The Grievance was denied by the grievance officer with the following reasons: **Nature of Grievance:** Inmate requests handrails be installed throughout the Vandalia Correctional Center including in shower and toilet facility areas, or that he be transfered to a facility that has these things, or go on electronic monitoring. **Facts Reviewed:** Vandalia Corr Center is an average prison which does not have special handrails throughout. Vandalia Correctional Center is not an ADA facility and therefore is not required to install handrails throughout. Per policy and procedure inmate must have at least a year left to submit for transfer to another institution. Inmate Jaros has approximately eight months left until parole therefore, inmate Jaros does not have enough time left for institutional transfer. Illinois Department of Corrections does not offer electronic detention as an early form of release at this time therefore, inmate can not be released on electronic detention.

13

recommendation: Grievance committee recommends denial of inmate grievance. Vandalia Correctional Center shall not try to conform to ADA standards due to cost and practicality restraints of the buildings due to the years they were constructed. There is no home monitor program at this time. And, inmate does not have enough time remaining on his sentence per institutional and IDOC policy for transfer to another facility. The grievance was signed by Clark Schultze. (See Exhibit S)

29. On July 19, 2010, Meek concurred with the decision of the grievance officer. (See Exhibit S)

30. On July 21, 2010, Jaros appealed the decision of the grievance to the Administrative Review Board. (See Exhibit T1-T4) Jaros continues to suffer severe physical pain.

## COUNT II - WORK RELEASE DISCRIMINATION

31. On August 17, 2010, Jaros had a physician visit with the institutional physician. During that visit Jaros questioned the physician Cleveland Rayford (Rayford) whether he had any objections to Jaros participating in the work release program. Rayford stated that he did not, as long as Jaros had his medication.

32. On September 7, 2010, Jaros requested to his counselor Harter that he be submitted for work release. Harter had stated to Jaros that on or about June 2010, that his name came down from Springfield to be submitted for work release. Jaros signed the application, and waited for Harter to contact him.

33. On September 8, 2010, Jaros received a memo from Harter

stating that there is a medical hold back on him, and he could not be submitted for work release. (See Exhibit U4)

34.  When Jaros discovered that there was a medical hold placed on him, he spoke to the Director of Nursing, Mary Halford, (Halford) from the HCU, who was the person responsible for placing the hold on Jaros. During that conversation, Jaros requested that Halford remove the hold from Jaros' file, stating that Dr. Rayford had no objection of Jaros participating in the work release program, as long as Jaros had his medications. Halford told Jaros that he uses a cane, and as long as he uses a cane the hold stays, that all inmates with a cane can't go to work release. Jaros then informed Halford that that was a violation of the ADA to discriminate against Jaros on the basis of his disability, Halford said "Oh well" and walked away from Jaros.

35.  On September 9, 2010, Jaros filed a grievance with Harter his counselor and head grievance officer, by placing a grievance in a plain white envelope addressed to her at the clinical services office. (See Exhibit U1)

36.  On September 15, 2010, Jaros received his grievance back from Harter, with the counselor's response which stated, "As of 9-14-10, offender still has a medical hold on OTS (Offender Tracking System). Offender does not meet the crieteria for work release and will not be resubmitted at this time." (See Exhibit U1)

37.  On September 20, 2010, Jaros filed the grievance with the grievance officer (Harter), the grievance was assigned to Clark Schultze (Schultze).

38.  On October 6, 2010, Jaros received the grievance back

15

from Grievance Officer Schultze, which was denied with conditions, as Follows:  **Nature of Grievance:** Inmate was denied work release for medical hold. Inmate alleges he was discriminated against as he claims to be disabled. Inmate Jaros states "I want to be resubmitted for work release." **Facts Reviewed:** Inmate Jaros A15173 was denied work release on 6-3-10 for a medical hold. **Recommendation:** Brievance Committee recommends Grievance be denied. Grievance Officer finds no discrimination. Inmate has no right to work release. Work release is given at the discretion of the Department of Corrections. Grievance was discussed with inmates counselor. Counselor decided to resubmit inmate Jaros' work release application to be reviewed for factors other than medical. Work release application was resubmitted, Grievance resolved.

39.  On October 7, 2010, Warden Victor Dozier concurred with the grievance officer, denying the grievance (See Exhibit U1)

40.  On November 5, 2010, Jaros mailed his appeal to the Administrative Review Board, with a letter addressed to the Director. (See Exhibit V 1-2 & U3)

41.  On October 14, 2010, The Medical Director made a notation in Jaros' Medical Record stating "OK to go to work release from Medical Director." (See Exhibit U6)

42.  On June 15, 2010, Jaros had written a letter to Sandra Funk, the Acting Manager of the Transfer Coordinator's Office for IDOC, requesting placement on the Electronic Monitoring Program, and advising her of the medical problems again, he alternatively asked to be transfered to an institution that could accommodate his disabilities. On or about March 25, 2010, Jaros went to the State

16

of Illinois Building located in Chicago, (prior to his incarceration) and had sent to Sandra Funk via inner-office mail from the IDOC Office at that building, a copy of his medical records. In the letter that accompanied the medical records Jaros explained that he will be sentenced on April 6, 2010, and arriving at IDOC in that month. He also requested accommodations for his disabilities, by requesting the Electronic Monitoring Program. At the same time, Jaros asked to speak to Dr Louis Schicker, who is the Medical Director for IDOC. Dr Schicker was not available for a meeting so Jaros left a compact disk which had a copy of Jaros' medical records on it. Jaros explained what it was to the secretary, and asked that it be given to Dr Schicker while requesting accomodations and again explaining that he will be arriving in IDOC after April 6, 2010, and will be needing accommodations due to his disabilities. The secretary accepted the compact disk, and stated to Jaros that she will give it to Dr. Schicker.

43. On September 7, 2010, Jaros had made a formal complaint to the U.S. Attorney for the Southern District of Illinois for violations of his civil rights, and violations of the Americans with Disabilities Act (ADA). (See Exhibit X 1-4)

44. On October 8, 2010, Jaros received a letter from the U.S. Attorney's Office for the Southern District of ILlinois, advising Jaros that the Department of Justice, and the U.S. Attorney's Office has opened an investigation against the Vandalia Correctional Center, with complaint numbers, USAO# 2010VO0446 and DJ# 204-25-81. (See Exhibit Y 1-2)

45. Due to the above complaints to the Transfer Coordinator,

17

and the U.S. Attorney, Jaros is being retaliated against for filing his complaints,and grievances. In violation of his civil rights, and in violation of the ADA, and Rehabilitation Act.

46.   On September 20, 2010, Jaros was called to Debbie Magnus' Office the Health Care Unit Administrator for Vandalia, Jaros had requested through her that the medical hold be removed, so Jaros would be able to participate in the work release program. Magnus avoided the main issue of the removal of the hold, and stated to Jaros "Thats how we do it here." and that if they sent Jaros to work release the ATC would send him back, because of his cane and disability. Jaros explained that it was a violation of the ADA to discriminate against him due to his disability, and that he would like to participate in the work release program. Jaros stated that he could work as a customer service representative, or do clerical work. That the Social Security Administration allows for the persons receiving benefits to work under the "Ticket to Work Program." Jaros told Magnus that Dr. Rayford had no objection to Jaros participating in the work release program. Magnus stated that she spoke to Rayford and he said that he said Jaros had to many health problems. Jaros then left Magnus' office with no resolution to the problem.

47.   On October 14,2010, Jaros had an appointment with Dr. Rayford, during that appointment Jaros asked Rayford if he had made the statement to Magnus about Jaros having to many medical problems to participate in work release. Rayford stated to Jaros "Nobody asked me about that." Rayford again stated that he had no problem with Jaros participating in the program as long as he had

18

his medications for pain. Jaros asked rayford to note the file. Rayford stated that he would note the file, and he did. (See Exhibit U6)

48.  On November 1, 2010, Jaros sent a request to Kevin Olliges (hereafter Oliiges), requesting information pertaining to the denial of his work release application. Olliges stated that Jaros was denied on September 1, 2010 as "Appropriately Placed". (See Exhibit AA1 & AA2)

49.  On November 5, 2010, Jaros again contacted Olliges requesting what Appropriately Placed meant and how he could overcome that decision. Jaros has received no answer to date.

50.  On December 10, 2010, Jaros received his grievance which was pertaining to work release back from the Administrative Review Board stating that it was not appealed in a timely manner. Jaros placed the grievance in a prepaid envelope and deposited it in the Unit Mailbox on November 5, 2010, the day he had written a cover letter to the Director of IDOC pertaining to the grievance. (See Exhibit V1 & V2)

51.  All defendants showed deliberate indifference to Jaros' physical pain, and medical conditions, and Jaros was forced into a situation  where he has to endure severe physical pain by walking, having to ascend and descend stairs and standing for long periods of time without the aid of handrails and ramps. In addition Jaros is limited in his ability to take showers due to no hand grips in the shower.

52.  All defendants had personal involvment in Jaros' constitutional deprivations, and that the violation of Jaros'

19

constitutional rights were caused by the implementation and the
usage of a custom, policy, or official act, IDOC and/or Vandalia
and its staff for liability purposes. Defendants disregarded their
duty by neglect and carelessly permitting the deliberate indifference
by causing Vandalia to be improperly and dangerously maintained in
an unsafe condition in that housing disabled inmates, by not having
hand rails in the shower and toiled areas, in addition to not having
hand rails throughout Vandalia in the walking areas of the prison.
The defendants had actual knowledge of those facts by Jaros' filing
of grievances, and complaining to his counselor, Transfer Coordinator,
and the U.S. Attorney's Office. Defendants did nothing to correct
these violations and continue to violate Jaros' rights.

## ARGUMENTS
## COUNT I - ACCOMMODATIONS

1.  Jaros being a disabled person within the meaning of the
statutes has requested and was denied accessibility  accommodations
for his disabilities. Jaros cannot stand in the shower or lift his
legs to wash without the use of hand rails, shower chair, or shower
hose for use while taking care of his personal hygene. Without these
accommodations Jaros is forced to go without showering for periods
of up to three weeks, due to the severe physical pain he has to
contend with when showering, without the accommodations. Jaros also
suffers from mental anguish due to the threats by other inmates
made to him, to throw Jaros in the shower and use a scrub brush or
a mop to clean him with. Jaros has to contend with these threats

20

on a daily basis because of his inability to stand, and lift his legs while showering, without severe physical pain. Jaros cannot balance on one leg and bend to wash without the use of hand rails mounted on the wall of the shower, or the use of a shower chair, and showre hose for his hygienic purposes. which has been refused by the defendants.

2.   Jaros cannot bend to sit on the toilets that are provided by Vandalia, without suffering from severe physical pain, along with the fear of falling to the floor. Vandalia only provides regular toilets, which are to low to the ground and does not provide hand rails for the use of Jaros and other disabled inmates. Here again Jaros has requested and been denied accommodations for the toilet hand rails, particularly by Shultze, Meek, Harter, McConaughy, Dozier, Funk, Taylor, and Olliges.

3.   Jaros has requested and been denied, ramps be constructed in the shower and entrance areas of the Dorm he resides in ("A" Dorm), along with other buildings which have stairs because of Jaros' inability to raise his legs to ascend or descend the stairs. Doing so causes Jaros severe physical pain. Jaros has fallen and stumbled several times attempting to ascend or descend the stairs, causing Jaros severe physical pain and the embarrassment of falling and or stumbling while correctional officers yell at him to "learn how to walk" or "pick up your feet" these insults causes Jaros severe mental anguish and embarrassment in front of other inmates and correctional officers.

4.   Jaros has requested and been denied the construction of hand rails throughout Vandalia to be used as hand grabs for resting

21

severe physical pain from walking becomes to great. Jaros must walk on a daily basis, to his job assignment at the school building and back to the dorm at least 4 times a day, which is approximately two and a half blocks in each direction. In addition Jaros must walk to and from the dining hall twice daily which is approximately two blocks in each direction.

5.  Vandalia's blatant refusal to supply these necessary and lawfully mandated accommodations pursuant to the ADA, Rehabilitation Act, and basic civil rights, and they knew posed "a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed2d 811 (1994); See also Hope v. Pelzer, 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed2d 666 (2002). In Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) Our Supreme Court said "[F]or at least a [half]-century, this court has made clear that . . . [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." To determine whether prison officials' conduct violates the eighth amendment in the context of prison conditions, we ask whether "The officials involved acted with deliberate indifference' to the inmates' health or safety." Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

6.  Courts have found that using the bathroom and restroom facilities is a basic activity of jail, and that prisons that do not provide shower chairs, handrails, or guard rails in the shower and toilet, or shower hoses to prisoners with disabilities violate the ADA and Section 504. U.S. v. Georgia, 546 U.S. 151, 157, 126 S.Ct. 877, 881, finding that "it is quite plausible that the alleged

22

deliberate refusal of prison officials to accommodate Goodman's disability-related needs in such fundimentals as mobility and hygiene, medical care, and usually all other prison programs constituted exclu[sion] from participation in or . . . den[ial] of] the benefits of the prisons services, programs, or activities." Pierce v. County of Orange, 526 F3d 1190, 1196 (9th Cir. 2006) holding a county in violation of the ADA because disabled prisoners were denied access to prison facilities like the bathroom and showers by physical barriers; Kiman v. New Hampshire Dep. of Corr., 451 F3d 274, 286-88 (1st Cir. 2006) holding denial of access to a shower chair (as well as other necessary accommodations) to a prisoner with disabilities raised an issue of material fact regarding defendant's failure to provide the prisoner with reasonable accommodations as required by ADA. Our own Seventh Circuit in Grant v. Schuman, No. 96-3760, 1998 US App Lexis 16852 at 7-8 (7th Cir. July 16, 1998)(unpublished) allowing prisoner with left-side paralis and nerve pain to go forward with ADA claim regarding lack of hand rails in toilet and shower areas, also in Love v. Westville Corr. Ctr, 103 F3d 558, 558-59 (7th Cir. 1996) upholding decision that quadriplegic prisoner's rights under ADA were violated when he was denied access to transition programs.

7. Jaros' rights under the Fourteenth Amendment Due Process and Equal Protection has been violated by defendants in violation of 42 USC 1983, and 42 USC§ 2000a-1, 2000a-2, and 2000a-6, in that defendants have shown deliberate indifference to Jaros' severe medical conditions and the denial of accommodations.

8. It is Jaros' contention that once an inmate with disabili-

ties is transferred to Vandalia as a permanent housing facility, even though officials it is not an ADA facility, it automatically becomes an ADA facility once disabled inmates is housed at that facility, and as such the ADA Rules and Regulations, along with the Rehabilation Act's Rules and Regulation become effective on Vandalia. Vandalia houses at a minimum ten inmates who have disabilities at one time, who are all suffering from pain, and use canes or crutches to walk with. Jaros suffers from severe physical pain on a daily basis, since his arrival at IDOC. He has requested accommodations and has been denied, Jaros will continue to suffer in the future as well as long as the accommodations he has requested is granted by Vandalia, and IDOC. Jaros' right to be free from cruel and unusual punishment under the Eighth Amendment has been violated by the defendants.

9.    That the provisions of 735 ILCS 5/3-8-2 Social Evaluations provided by IDOC in determining where a prisoner is to be placed taking into consideration various factors such as medical, psychological, social. If done properly the counselors, along with Funk and Taylor would have discovered that Jaros had severe medical conditions, and had disabilities, and should not have sent him to a non ADA facility where they knew that Jaros' disabilities would not be accommodated. Especially while Funk and Schicker had prior knowledge of Jaros' medical condition and disabilities a full month prior to Jaros' arrival in IDOC, when Jaros dropped off his medical records at the Chicago Office of the IDOC.

## COUNT II - WORK RELEASE

1.   Jaros was denied participation in the Work Release
program because defendant Mary Halford had placed a medical
hold on Jaros. Jaros requested directly to her that she remove
the hold and Halford refused, stating "You have a cane the hold
stays. As long as you use a cane you cannot go to work release."
Jaros informed her that such action is a violation of the ADA,
and violated his civil rights. Halfors told Jaros "So what," and
walked away from him.

2.   Jaros put in a request to Debbie Magnus, the Health Care
Administrator, to request that the medical hold be removed from
his file. Magnus refused by avoiding the main issue and stating
"Thats how we do it here." Jaros explained to Magnus that there is
a program that is used by the Social Security Administration, which
allows a benefit receiver to work, which was called the Ticket to
Work Program. Jaros further explained to Magnus that he would be
able to have his priscription medications to control his severe
physical pain. Recently our Supreme Court in Pennsylvania Department
of Corrections v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d
215, wherein Justice Scalia held for a unanimous Court that "Title
II of the ADA, prohibiting "public entity" from discriminating
against "qualified individual with a disability" on account of that
individual's disability, applied to inmates in state prisons.".

3.   Jaros was discriminated against by Halford's and Magnus'
refusal to remove the medical hold from Jaros' file. That procedure
is a custom, policy, or official act used by vandalia in screening
out disabled inmates from participation in the Work Release Program.
Either Halford, Magnus or both have violated Jaros rights in consert

25

with the clinical services department, which excludes inmates with a medical or psych holds from the application process for the Work Release Program. Thus violating their right to Due Process and Equal Protection of the laws, as well as the Cruel and Unusal Punishment clause. In the case of Gray v. Hernandez (S.D. Cal 2009) 651 F.Supp.2d 1167, the court stated that "casual connection between a supervisory public official's wrongful conduct and the constitutional violations, for purposes of stating a claim against a supervisory public official for liability under §§1983 may be supported with allegations the supervisor set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others which he knew or reasonably should have known would cause others to inflict the injury." In the instant case, when Jaros spoke to either Halford or Magnus one or both should have known that Jaros' rights were being violated, especially after showing Magnus a copy of the Yeskey decision during his conference with her, and that due to the policy, custom, or official act of disallowing and discriminating against disabled inmates such as Jaros to participation in the Work Release Program based oh their (his) disabilities violated the disabled inmates rights in this case Jaros', along with their retaliation for Jaros making the Grievances and writing letters to officials concerning these issues. Jaros went out of his way to explain to all those concerned that his rights were being violated, by supplying them with copies of various court decisions.

4. Magnus had only to order Halford to remove the medical hold from Jaros' file being her supervisor, and Health Care Unit Supervisor.

5.  Further, Harter should have known that Jaros' rights
were being violated as she had to review the grievances, and read
the attached cases to the grievance, as well as, Dozier, and
Schultze should have known, but failed to act. Courts consider
officials and local government agencies to be personally involved
if they (1) Directly participated in the wrong; or (2) Knew about
the wrong but did not try to stop or fix it; or (3) Failed to
oversee the people who caused the wrong, such as by hiring unqual-
ified people or failing to adequately train the staff; or (4) Created
a policy or custom that allowed the wrong to occur.

6.  Once Meek and McConaughy had received the letter from
Funk pertaining to Jaros' medical conditions and ADA complaint,
they should have initiated an investigation to ascertain what the
problem was. By not doing so further violated Jaros' rights by
their showing of deliberate indifference for Jaros' serious medical
conditions, as any reasonable person would know that their actions
violated a clearly established right, not to mention the violation
of Jaros' Eighth Amendment right to be free from  Cruel and Unusual
Punishment. To violate the Eighth Amendment, conditions must amount
to "unquestioned and serious deprivations of basic human needs" or
of the "minimal civilized measure of lifes necessities" or constitute
the "wanton and unnecessary infliction of pain." Rhodes v. Chapman,
452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59, 69, (1981).
The right to be free from Cruel and Unusual Punishment, must show
physical injury for mental or emotional injury. Recent Supreme Court
cases have emphasized threats to prisoners health and safety, such
as conditions that "pose an unreasonable risk of serious damage to

[a prisoner's] future health" or "Excessive risks to inmate health and safety." Helling v. McKinney, 509 U.S. 25, 35, 113 S.Ct. 2475, 2481, 125 L.Ed.2d 22, 32 (1993); Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811, 825 (1994). Jaros has been deprived of the basic human needs, and did so with the frame of mind that they did not have to comply with the constitution, and court rulings, they had actual knowledge that they were violating Jaros' rights and did not care. Jaros has shown that alone or in combination the conditions deprived him of "the minimal civilized measure of life's necessities.

## COUNT IV - FAILURE TO TRAIN, SUPERVISE, OR DISCIPLINE

1. There is a pattern of repeated unconstitutional behavior by the defendants, at some point this pattern makes it obvious that more or better training, supervision or discipline is needed to prevent such behavior. Bd of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626, 641, noting that policymakers' awareness of a pattern of unconstitutional conduct by employees along with a failure to address the problem, may demonstrate conscious disregard for a need to train, would give raise to municipal liability. At Vandalia the practice to disallow inmates with disabilities to apply for and/or participate in the Work Release Program, is a policy or custom which violates disabled inmates' rights, moreover, a prison can also be held responsible for a custom or settled practice of the prison that is unconstitutional. There is a clear link between the existence of the policy

28

or custom and a constitutional violation.

## RELIEF

Wherefore, plaintiff, Phillip E. Jaros, requests this Honorable Court grant the following relief:

A.  Issue a declaratory judgment that the State of Illinois and the Illinois Department of Corrections have violated 42 USC 12131 et seq, The Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973 as ammended 29 USC 749, By:

1) Refusing to provide accommodations to plaintiff for hand grips, shower chair, or shower hose in the shower area of the dormatory he is housed in which is "A" Dorm. Or in any area he may be housed in due to his disabilities;

2) Refusing to provide accommodations to plaintiff for hand grips in the toilet areas of plaintiffs dorm or any area he may be housed in within the Vandalia Correctional Center, which could be used by plaintiff or other disabled inmates;

3) Refusing to provide accommodations to plaintiff by not providing hand rails or rest areas throughout the Vandalia Correctional Center, for use by plaintiff or other disabled inmates;

4) Refusing to provide accommodations to plaintiff by not providing ramps at the entrance of dormatories, dining room, commissary, B of I, clothing room, and personal property room, or to provide an alternate means of access for plaintiff or other disabled inmates.

5) Discriminating against plaintiff and other disabled inmates by refusing to complete the application process and the participation in the Work Release Program, by excluding inmates who have disabilities, and inmates with medical holds because of a disability, from the application process, and the participation in the Work Release Program;

6) Retaliating against plaintiff for filing complaints and grievances, by denying him to apply and participation in the Work Release Program;

7) Retaliating against plaintiff filing, complaints and grievances against the Vandalia Correctional Center, and or its employees, and speaking on the telephone to the Assistant U.S. Attorney for the Southern District of Illinois, and two days later being terminated from his job assignment as a legal clerk;

B.   Enter a Declaratory Judgment declaring that the plaintiff is a disabled person with in the meaning of the law,

C.   Enter a declaratory judgment that the defendant's either individually or in concert with other defendants have violated one or more of the plaintiff's constitutional rights under 42 USC 1983, 1985, the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in that the defendant's have:

a) Shown deliberate indifference to plaintiff's severe physical pain, by:

1. Forcing plaintiff to ascend and descend stairs at the buildings of Vandalia Correctional Center, particularly; dormatories, dining room, commissary, clothing room, personal property room;  B of I, causing him severe physical pain, and

mental anguish.

2. Forcing plaintiff to go without daily showers by not providing plaintiff with hand grips, shower chair, or shower hose with which plaintiff could take care of his personal hygeine in the shower area of the dorm he is assigned to which is "A".

3. Forcing plaintiff to suffer from severe physical pain, mental anguish, by not providing hand grips in the toilet area, or a raised tiolet, for use by plaintiff as mandated by the ADA, and the Rehabililation Act of 1970.

4. Forcing plaintiff to suffer from severe physical pain and fatigue by not providing plaintiff with hand rails throughout the Vandalia Correctional Center or rest areas in various locations throughout the facility, and forcing him to walk up to, two and one half blocks, a minimum of four times a day since August 2010 to go to his job assignment at the school building. And at least two blocks to the dining room at least four times per day to eat meals. (plaintiff does not go to breakfast due to pain at the early hours of the day upon awakening.) also, causing his asthma to act up while walking, where he cannot rest during those walks to eat;

5. Not classifying plaintiff properly pursuant to 730 ILCS 5/3-8-2 for his Social Evaluation at the reception facility, and deciding not to transfer him to an ADA facility and overlooking his disabilities;

6. Not transfering plaintiff to an ADA facility once it was discovered that plaintiff was a disabled inmate during his stay at the Vandalia Correctional Center, where his disabilities would be accommodated better, especially when the Medical Director of IDOC, and the Transfer Coordinator knew of plaintiffs disabilities prior

to his incarceration where he requested accommodations prior to his imprisonment and gave notice to IDOC that he would be in their custody in the month of April;

D.  Enter a declaratory judgment declaring that defendants violated plaintiffs constitutional rights under the First, Eighth, and Fourteenth amendments of the United States Constitution, by discriminating and retaliating against plaintiff by denying him to apply for and participatate in the work release program based on his use of a cane and his disabilities, and by placing a medical hold on plaintiff knowing he would be disqualified automaticaly. Also, for retaliating against plaintiff for filing grievances and/or making complaints to the US Attorney about the violations of the ADA at the institution. Plaintiff was terminated from his job assignment as a law library clerk, after talking to the US Attorney's office on the telephone about his complaints.  On December 14, 2010, plaintiff was called to the Yard Office at Vandalia for an Attorney phone call, which happened to be to Mr. James  M. Hipkiss, an Assistant United States Attorney for the Southern District of Illinois. On December 17, 2010 plaintiff was informed that he no longer was a clerk at the law library as he had been terminated from his job assignment.

E. Enter a declaratory judgment declaring that plaintiff's Constitutional rights have been violated under the First, Eighth, and Fourteenth amendments to the United States Constitution, by retaliating against plaintiff for excercising his rights to file greviances, and writing complaints to governmental agencies pertaining to the the conditions and violations of the ADA by Vandalia Correctional Center.

32

F. Enter a declaratory judgment declaring that plaintiff's Constitutional Rights have been violated under the First, Eighth, and Fourteenth amendments to the United States Constitution, by failing to train, supervise, or discipline, because of the pattern of repeated unconstitutional behavior. It is obvious that more or better training, supervision, or discipline is needed at Vandalia Correctional Center and IDOC as a whole, when transfering inmates with disabilities to non ADA facilities, along with terminating an inmate from a job assignment, and denying the application process, and participation of the work release program due to discrimination and retaliation, on the basis of that inmates disabilities, and/or his choice toair his grievances and complaints;

G. Issue an injunction ordering that defendants or their agents:

1. Refrain from housing disabled inmates at the Vandalia Correctional Center until vandalia is in compliance with the ADA, and the Rehabilation Act by:

a) Constructing Hand Grips in the shower and toilet area of the dormatory in which a disabled inmate will be housed, or;

b) Providing a shower chair and shower hose for use by disabled inmates in addition to the hand grabs.

c) Construct hand rails or rest areas consisting of a seat where a disabled inmate may sit to rest and/or relax their pain, throughout the institution at various locations.

d) Construct ramps in dormatory shower and toilet areas, and at the enterence of all buildings which have stairs, including: dormatories, dining room, B of I, clothing room, commissary, personal property room, chapel, or provide an alternate means for access to these areas without having disabled inmates ascend or descend stairs,

especially those inmates who use canes or crutches, and braces for
walking;

2. Refrain from discriminating against inmates who have
disabilities from participating in the application and/or participation
in the work release program, or the work camp program by removing
medical holds from their files, or not placing a medical hold on a
disabled inmate, which may disqualify him from participation, and/or
application in programs of the prison because of his disability, or
the use of a cane or crutches;

3. Refrain from retaliating against inmates who choose to exert
their first amendment right to petition and file grievances, and
complaints against the Vandalia Correctional Center, to either the
administration or others including newspapers, or governmental bodies;

4. ORDER the Illinois Department of Corrections to better screen
inmates in the receiving centers to determine whether an inmate is a
disabled person, and to transfer that inmate to a facility which can
accommodate his disability;

5. ORDER The Illinois Department of Corrections to transfer any
inmate with disabilities to a facility which can accommodate his
disabilities;

6. ORDER the Illinois Department of Corrections to begin the
consideration of inmates with disabilities for Home Electronic
Monitoring for prisoners with disabilities, who do not have a long
sentence to serve, pursuant to 730 ILCS 5/5-8A-3(d)(e)(f), and others
who meet the qualifications of that statute;

E. GRANT compensatory damages in the following amounts:

1) $100,000 from each defendant individually for violating

plaintiff's constitutional rights and causing him extreme physical pain, and mental anguish, by being deliberately indifferent to his disabilities, and acting in unison with each other in order to intentionally conspire against plaintiff to violate his rights, or by acting independentally to violate plaintiffs constitutional rights under the First, Eighth, and Fourteenth amendments to the United States Constitution;

2) $100,000 from each defendant for violating plaintiff's rights in their official capacity as employees of the Illinois Department of Corrections, and State of Illinois, while performing their official duties as employees, and conspiring to be deliberately indifferent to plaintiff's severe physical pain, by not accommodating plaintiff's disabilities, and causing him mental anguish and discriminating against him by disqualifying him from the application process, and participation in the work release program, on the basis of his use of a cane, and his disabilities. In addition defendants discriminated against plaintiff by placing the medical hold on him based on his filing of complaints against them along with grievances thus violating plaintiff's First, Eighth, Fourteenth amendments to the United States Constitution;

3) GRANT punitive damages in the amount of $300,000 from each defendant, for intentionally and with malice violating plaintiff's First, Eighth, and Fourteenth amendments to the United States Constitution, and by acting with deliberate indifference for his constitutional rights, and misconduct;

Nominal damages in the amount of $10,000 from each defendant for the fact that they did violate plaintiff's Constitutional rights

5) Monitary Damages in the amount of $100,000 against the State of Illinois and/or Illinois Department of Corrections to plaintiff for a second or higher violation of the Americans with Disabilities Act and/or Rehabilitation Act for the total disregard, deliberate indifference, and malicious intent, and for failure to make policy or take action to prevent predictable violations of rights within the Vandalia Correctional Center as well as the Illinois Department of Corrections.

6) GRANT such other relief as this Honorable Court believes plaintiff is entitled to including, costs, fees, and Attorney's Fees.

### DECLARATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

I certify to the best of my knowledge, information and belief, that this complaint is in full compliance with Rule 11(a) and (b) of the Federal Rules of Civil Procedure. The undersigned also recognizes that failure to comply with Rule 11 may result in sanctions.

Signed on: **3-3-11**
       Date

Rt 51 North, P.O. Box 500
       Street Address

Vandalia, Illinois  62471
       City, State, Zip

*Phillip E Jaros*
       Signature of Plaintiff

Phillip E. Jaros
       Printed Name

A-15173
       Prisoner Register No.

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF ILLINOIS

PHILLIP E. JAROS,                    )
                 Plaintiff,          )
                                     )
                                     )
     -vs-                            )        Cause No. _____
                                     )
                                     )
GLADYSE TAYLOR, Director,            )
Illinois Department of               )
Corrections, et al.,                 )
                 Defendants,         )


STATE OF ILLINOIS )
                  ) SS
COUNTY OF FAYETTE )


## AFFIDAVIT AND VERIFICATION

I, Phillip E. Jaros, deposes and says that as to the Affidavit
herein, he is the plaintiff in the above entitled cause; That he
has read the foregoing document by him signed and that the statements
contained therein are true in substance and in fact, under 28 U.S.C.
1746; 18 U.S.C. 1621, 735 ILCS 5/1-109 Illinois Code of Civil Procedure.

Dated this 3rd day of MARCH , 2011

                              _Phillip E. Jaros_
                              Phillip E. Jaros, Plaintiff Pro se